UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

NICHOLAS CUTTING, *et al.*,

Plaintiffs,

v.

YOKE INDUSTRIAL CORP., *et al.*,

Defendants.

CASE NO. 3:20-cv-05346-BHS-JRC

REPORT AND RECOMMENDATION

NOTED FOR: August 5, 2022

This matter is before the Court on referral from the district court and on the parties'
cross-motions for summary judgment. *See* Dkts. 48, 54, 55.

Plaintiffs, Nicholas Cutting and his wife Kathryn Cutting, brought this product liabilities
action against Yoke Industrial Corp. and Yoke Niagara (collectively "Yoke defendants"), as well
as Werner Co. and Home Depot USA, Inc. (collectively "Werner defendants"), who are
manufacturers and sellers of a fall protection system that Mr. Cutting used when he fell while
working atop the roof of a garage. Plaintiffs seek to hold defendants liable because of an alleged
design defect in the manual rope grab included in the fall protection system. That design defect is

referred to as a "death grip" hazard, which occurs when the product user falls and instinctively grabs the rope grab, preventing it from arresting the user's fall. Plaintiffs and defendants all move for summary judgment as to defendants' liability under the Washington Products Liability Act ("WPLA") regarding the alleged design defect. After reviewing the relevant material, the Court concludes that issues of material fact remain as to whether the product at issue contains a design defect and whether the defect proximately caused the alleged injuries.

Regarding the existence of a design defect, the parties present disputed evidence that the manual rope grab at issue fails to arrest a user's fall if it is grabbed in a manner that prevents the lanyard that attaches the user to the rope grab to pull on the rope grab. The Court rejects the parties' requests to exclude each other's experts or their opinions as to this issue and concludes that there are issues of material fact to be resolved at trial. Further, because the failure to warn claim depends on the existence of a design defect, summary judgment as to that claim should also be denied. Finally, regarding the issue of proximate cause, the Court sees no reason to depart from the general rule that the cause in fact inquiry is best left to the jury considering the parties have submitted disputed evidence as to whether Mr. Cutting grabbed, or was capable of grabbing, the rope grab during his fall.

Accordingly, the Court recommends that the parties' cross-motions for summary judgment be denied.

## BACKGROUND

The following facts are undisputed by the parties unless otherwise noted. In 2017, Mr. Cutting was hired to build an RV garage on a residential property. *See* Dkt. 48, at 5. Part of the job required Mr. Cutting to install roof sheathing. *See id.* at 6. Thus, Mr. Cutting went to Home Depot to purchase a fall protection system. *See id.*

REPORT AND RECOMMENDATION - 2

Defendant Werner manufactures fall protection systems, which consist of harnesses, anchors, and lanyards. *See* Dkt. 54-2, at 6. One of defendant Werner's fall protection systems is the UpGear K211201 lifeline system, which it developed in 2012 and placed in production in 2013. *See id.* The system uses a manual rope grab that defendant Yoke manufactures. *See* Dkt. 49-5, at 7. Defendant Werner sold, and continues to sell, the fall protection system through Home Depot and other retailers. *See* Dkt. 54, at 5.

Mr. Cutting purchased the UpGear K211201 lifeline system at Home Depot. *See* Dkt. 48, at 5. On April 11, 2017, Mr. Cutting was working on the roof of the RV garage using the fall protection system he had recently purchased. *See* Dkt. 48, at 7–8. As Mr. Cutting was leaning down to remove a cleat, his left foot slipped and he fell off the roof onto the ground below. *See id.* Mr. Cutting suffered injuries to his spine that required surgery. *See id.* at 8.

Plaintiffs initiated two product defect actions in early 2020. *See* Dkt. 1, cause no. 3:20-cv-05163; Dkt. 1, cause no. 3:20-cv-05346. On August 31, 2020, the Court consolidated plaintiffs' actions. *See* Dkt. 29. On September 18, 2020, plaintiffs filed a consolidated amended complaint. *See* Dkt. 31. Plaintiffs allege that defendants Werner Co., Home Depot, U.S.A., Inc., Yoke Industrial Corp., and Yoke Niagara, are liable for the injuries plaintiff suffered when he fell from the roof of an RV garage he was working on. *See* Dkt. 31, at 7.

On April 14, 2022, plaintiffs moved for summary judgment against defendants Werner Co. and Yoke Industrial Co. as to their violation of the WPLA. *See* Dkt. 48, at 3. On May 3, 2022, the Court set a briefing schedule for dispositive motions and renoted plaintiffs' motion for summary judgment to June 21, 2022 and ordered that any dispositive motions by the defendants had to be noted by June 20, 2022. *See* Dkt. 53. On May 6, 2022, defendant Yoke Industrial Corp filed a motion for summary judgment as to its liability under the WPLA. *See* Dkt. 54. The

Werner defendants filed a motion of their own on the same day, which also seeks summary judgment as to their liability under the WPLA. *See* Dkt. 55. Along with their motion for summary judgment, the Werner defendants filed a motion to exclude plaintiffs' expert witnesses. *See* Dkt. 56. The motions have been fully briefed and the matter is ripe for decision.

## DISCUSSION

### I.    Motions to Exclude Expert Testimony

The Court first addresses the parties' motions to exclude expert witness testimony. *See* Dkts. 56; 61, at 14–19; 59, at 15–20.

### A.    Legal Standard

Pursuant to Federal Rule of Evidence 702:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Although Rule 702 should be applied with a "liberal thrust" favoring admission, *Daubert v. Merrell Down*, 509 U.S. 579, 588 (1993), the rule requires that expert testimony be both relevant and reliable. *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565. Broad discretion is given to the trial court to admit or exclude expert testimony. *See Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996) (internal citations omitted).

///

1

     **B.**  **Werner Defendants' Motion to Exclude Expert Witnesses**

2

      **1.**  **Jeremy Bauer**

3

   The Werner defendants move to exclude plaintiffs' expert witness, Dr. Jeremy Bauer. *See*

4

Dkt. 56. Plaintiffs retained Dr. Bauer "to analyze the subject product, review case materials, and

5

offer opinions related to the subject product used by [Mr.] Cutting during the fall incident." Dkt.

6

50, at 2. On December 9, 2021, Dr. Bauer produced a 15-page report in which he offers several

7

opinions. *See* Dkt. 50-2. Specifically, Dr. Bauer opined the following:

8

   1) The Werner UpGear Fall Protection System and included Yoke ro[p]e grab
   failed to arrest Mr. Cutting's fall because Defendants failed to account for a

9

   person's natural reaction to a fall when they designed and manufactured the
   system; 2) The mechanism designed to prevent a person from sustaining a fall is

10

   easily defeated by grabbing the rope grab, or above the rope grab, during a fall; 3)
   Mr. Cutting's actions to attempt to arrest his fall were reasonable and consistent

11

   with human biomechanics; 4) At the time of his fall, Mr. Cutting was using the
   UpGear Fall Protection System in a foreseeable manner, in accordance with the

12

   provided instructions and a demonstration video published by Werner; and 5) The
   UpGear Fall Protection System was defectively designed and unreasonably

13

   dangerous given it is foreseeable that a person will attempt to arrest their fall by
   reaching and grabbing objects during descent, including the object (rope grab)

14

   meant to arrest their fall if it is conveniently within reach.

15

*Id.* at 15.

16

   Defendants argue that the Court should exclude all of Dr. Bauer's testimony and opinions

17

because he is not qualified to render those opinions and because he used unreliable

18

methodologies in forming his opinions. *See* Dkt. 56, at 5–13. The Court addresses both reasons

19

in turn.

20

   As to his qualifications, defendants argue that Dr. Bauer is not qualified to offer opinions

21

"regarding fall protection designs, defects, or causation and accident reconstruction related

22

thereto" because he does not have specialized training and practical experience in the fall

23

protection field. Dkt. 56, at 8. Specifically, defendants argue that Dr. Bauer has never designed

24

1    any part of a fall protection system, never testified in a fall protection case, and never authored

2    anything related to fall protection. *See* Dkt. 56, at 8.[1] In response, plaintiffs argue that Dr.

3    Bauer's decades of education, training, and experience make him qualified to render opinions

4    "relating to the fall dynamics at the core of this case and to give an assessment of the function of

5    the subject product based on sound principles of fall dynamics . . . ." Dkt. 62, at 11.

6         According to his curriculum vitae, Dr. Bauer has a B.S. in physical education with an

7    emphasis in biomechanics, a M.S. in human performance (biomechanics), and a Ph.D. in human

8    performance (biomechanics). *Seee* Dkt. 50-1, at 2. As part of his education, Dr. Bauer states that

9    his coursework included mechanical engineering, math, physics, anatomy, and physiology. *See*

10   Dkt. 64, at 3. He also has considerable research and consultant experience in various fields,

11   including accident/collision reconstruction, fall dynamics, and injury biomechanics. *See* Dkt. 50-

12   1, at 2.

13        The Court does not require an expert witness to possess specialized expertise with an

14   industry or product to render every opinion relating to that industry or product. Rather, the

15   pertinent question is whether the expert's qualifications "provide a foundation for [him] to

16   answer a specific question." *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (citing

17   *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)); *Lott v. ITW Food Equip. Grp. LLC*,

18   No. 10 CV 1686, 2013 WL 3728581, at *6, 14 (N.D. Ill. July 15, 2013) (holding that mechanical

19   engineer proffered as expert witness need not have experience engineering the particular piece of

20   equipment at issue).

21

22

---

23        [1] Defendants also appear to argue that Dr. Bauer is not qualified because the
     methodologies he employed to reach his opinions were deficient. *See* Dkt. 56, at 8. However,

24   that argument applies to Dr. Bauer's opinions' reliability, not his qualifications.

1    Based on Dr. Bauer's education and experience, the Court concludes that he is qualified

2    to render opinions concerning Mr. Cutting's fall. For example, his experience with fall dynamics

3    and accident reconstruction qualifies him to render opinions regarding Mr. Cutting's position on

4    the roof and his movements as he fell. Further, his educational experience in mechanical

5    engineering, math, and physics gives him the basic scientific principles necessary to opine

6    whether the rope grab can be defeated by grabbing the rope grab or above the rope grab during a

7    fall.

8    However, Dr. Bauer is not qualified to render an opinion as to the ultimate issue of law,

9    such as whether the product at issue was defectively designed and unreasonably dangerous.

10   Notably, he has never testified in a case involving a fall protection system. *See* Dkt. 56-1, at 5–6,

11   8–9. He also does not have research or consulting experience with fall protection systems. *See*

12   Dkt. 56-1, at 8–11. He testified that he is unaware of manual rope grabs with anti-panic features.

13   *See* 56-1, at 19. He states that he has experience rock climbing and has attempted to ascend Mt.

14   Rainier "where team roping and fall protection were essential," but he is otherwise not accredited

15   in fall protection and does not have any professional or personal experience with the product at

16   issue besides the work done for this case. *See* Dkt 56-1, at 22. He also testified that he is unaware

17   of the benefits with using manual rope grabs over trailing rope grabs. *See* Dkt. 56-1, at 20.

18   Finally, expert witnesses "cannot offer opinions as to their legal conclusions, i.e., opinions on

19   ultimate issues of law." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th

20   Cir. 2004).

21   Regarding the reliability of Dr. Bauer's opinions, defendants argue that Dr. Bauer

22   employed an unreliable methodology to render his opinions. *See* Dkt. 56, at 9. In evaluating

23   reliability, the Court "must assess the expert's reasoning or methodology, using as appropriate

24

criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). However,

> [t]he test of reliability is flexible and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.[] The list of factors was meant to be helpful, not definitive,[] and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable,[] based on the particular circumstances of the particular case.

*Primiano*, 598 F.3d at 564 (cleaned up).

"A district court may permissibly choose not to examine factors that are not 'reasonable measures of reliability in a particular case.'" *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017). The Court's function is to "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Further, the Court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969–70.

Scientific reliability can be found where the methodology "can be or has been tested." *City of Pomona*, 750 F.3d at 1046 (quoting *Cooper v. Brown*, 510 F.3d 870, 880–81 (9th Cir. 2007)). The relevant inquiry "is whether an expert's methodology can be 'challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'" *Id.* (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments). "Testability 'assures the opponent of proffered evidence the possibility of meaningful cross-examination (should he or someone else undertake the testing).'" *Id.* (quoting *United States v. Mitchell*, 365 F.3d 215, 238 (3d Cir. 2004)). The primary

1    requirement under the testability factor is that "[s]omeone else using the same data and methods .

2    . . be able to replicate the result[s]." *Id.* at 1047 (alterations in original).

3          Here, Dr. Bauer conducted four tests on the product at issue to determine under what

4    circumstances the rope grab moves along the lifelines. *See* Dkt. 50-2, at 7–8. He also inspected

5    the scene of the incident and used a 3D scanner to measure the structure Mr. Cutting fell from.

6    *See id.* Dr. Bauer then used these tests in combination with deposition testimony and other case

7    materials to form his opinions. *See id.* These tests can be replicated, and defendants have an

8    opportunity to cross-examine Dr. Bauer regarding his testing.

9          Defendants' motion mainly targets the weight of Dr. Bauer's opinions and not their

10   reliability. For example, defendants argue that Dr. Bauer's tests with the rope grab are unreliable

11   because Dr. Bauer conducted them while standing and sitting down in an office and not in a slip

12   or fall situation to replicate the circumstances of Mr. Cutting's fall. *See* Dkt. 50-2, at 8; 56-1, at

13   25, 28. Again, defendants can cross-examine Dr. Bauer and the jury will decide how much

14   weight to assign. At this stage, his tests sufficiently support his opinion that the manual rope grab

15   slides along the lifeline when it is pulled and without tension on the lanyard. Finally, the

16   circumstances of this case—mainly the relative simplicity of determining whether the manual

17   rope grab can move along the lifeline—do not require that Dr. Bauer's opinions be published in

18   peer-reviewed literature.

19         Accordingly, the Court concludes that Dr. Bauer is qualified to issue all of his opinions

20   except those in which he concludes that the product at issue is defectively designed. Further, the

21   Court concludes that the opinions he qualified to render are sufficiently reliable to survive the

22   *Daubert* inquiry. Therefore, the Court grants in part and denies in part defendants' motion to

23   exclude Dr. Bauer.

24

1

## 2.     Joellen Gill

2          The Werner defendants also move to exclude plaintiffs' other expert witness, Ms. Joellen

3    Gill. *See* Dkt. 56. Plaintiffs retained Ms. Gill to "analyze the subject product, review case

4    materials, and offer opinions related to the subject product used by Nicholas Cutting during the

5    fall incident." Dkt. 51, at 2. On October 27, 2021, Ms. Gill produced an 11-page report in which

6    she rendered the following opinions:

7            1. The subject harness, when used in a foreseeable manner, contained a functionally
             hidden hazard (i.e., the rope grab which was designed to release when grasped)
8            which was not effectively mitigated.
             2. Mr. Cutting was not provided with any warnings/instructions as to how to avoid
9            the hazard of inadvertently reaching for and grasping the rope grab during the
             initiating of a fall.
10           3. Mr. Cutting's actions were consistent with foreseeable human behavior.

11   Dkt. 51-2, at 12.

12          As with Dr. Bauer, defendants argue that the Court should exclude all of Ms. Gill's

13   testimony and opinions because she is not qualified to render those opinions and because she

14   used unreliable methodologies in forming her opinions. *See* Dkt. 56, at 5–13. However, although

15   defendants move to exclude all of Ms. Gill's testimony and opinions, their motion appears to

16   only target Ms. Gill's opinion as to the existence of a hidden hazard in the product at issue. *See*

17   *generally* Dkt. 56. Therefore, the Court will only consider that aspect of her opinion.

18          As stated above, the Court does not require an expert witness to specialize in the specific

19   industry or product at issue to be qualified as an expert. Ms. Gill has extensive educational and

20   professional experience in human factors engineering, which she explains is "the science that

21   combines the traditional engineering disciplines, such as mechanical engineering, safety

22   engineering, and accident reconstruction . . ., with the science of human behavior, such as human

23   perception, learning and memory, cognition, decision making, response selection and execution,

24

1    anthropometrics and the like." Dkt. 51-2, at 2–5. She also has experience as a consultant in

2    warning design and effectiveness and has provided consulting services to private industry and

3    businesses in the field of safety and risk management. *See id.* at 4–5. Thus, Ms. Gill is qualified

4    to offer her opinions as to this issue.

5           Regarding reliability, unlike Dr. Bauer, Ms. Gill's opinions as to the existence of a fall

6    hazard are not based on her independent testing. Instead, to reach her conclusion that the product

7    at issue contains the fall hazard, Ms. Gill states that she "inspected the subject product and

8    researched comparable fall protection systems involving rope grabs." Dkt. 63, at 3. However,

9    Ms. Gill states that she "focused on the fact that there existed the technology to develop a rope

10   grab that does not result in the fall hazard when grabbed in a fall scenario." Dkt. 63, at 7. In other

11   words, Ms. Gill's opinion that the fall hazard exists in *manual* rope grabs is based on the fact that

12   the hazard exists in *trailing* rope grabs. Although she claims she found a manual rope grab with

13   anti-panic features, *see* Dkt. 63, at 6, as defendants point out, that rope grab is a hybrid rope grab

14   that switches between trailing and manual modes. *See* Dkt. 63-3, at 4. She does not say whether

15   the anti-panic feature in that rope grab activates under both modes and does not otherwise know

16   of manual rope grabs with anti-panic features. *See* Dkt. 55-1, at 41.

17          Further, Ms. Gill does not explain the differences in the locking mechanisms in both

18   types of rope grabs and instead states that "the difference between a manual and trailing rope

19   grab is that one you interact with (manual) and one follow or 'trails' you (trailing)." Dkt. 63, at

20   6–7; *See also* 55-1, at 39–40. She does not base her opinion on any studies or testing on the

21   product. As such, Ms. Gill's opinions regarding the existence of the death grip hazard in the

22   manual rope grab at issue in this case does not pass the *Daubert* reliability test.

23

24

Accordingly, the Court grants defendants' motion to exclude Ms. Gill's testimony and opinions to the extent that she opines as to the existence of a death grip hazard in the product at issue. The motion is otherwise denied.

### C.    Plaintiffs' Motions to Strike

In their response to defendants' motions for summary judgment, plaintiffs request that the Court strike the entire declaration of defendants' expert, William David Lough, and strike certain opinions offered by defendants' expert Keith Schippers. *See* Dkts. 59, at 15; 61, at 15.

#### 1.    William David Lough

Defendants retained Mr. Lough to serve as an expert witness in this matter. *See* Dkt. 54-4, at 2. Mr. Lough is the vice president of operations of Gravitec Systems, Inc., a fall protection specialist company. *See id.* at 4. Plaintiffs seek to exclude the testimony of Mr. Lough because he testified that he was not going to be an expert witness and failed to explain the methodology for his opinions and instead deferred to his colleague, Mr. Schippers. *See* Dkt. 59, at 16. After reviewing the relevant record, the Court concludes that both arguments lack merit.

First, Mr. Lough did not testify that he was not going to be an expert witness. Plaintiffs make much of Mr. Lough's statement that Mr. Schippers "will be the expert witness person for Gravitec Systems." Dkt. 60-1, at 5. However, this statement does not mean that Mr. Lough will not serve as an expert himself. Defendants designated Mr. Lough as an expert and he stated that he was retained by defendants to do so. *See* Dkt. 67, at 4; *see also* Dkt. 54-4, at 2 (declaration by Mr. Lough stating that he was retained by defendants to provide opinions related to the subject incident).

Second, the fact that Mr. Lough did not explain certain aspects of Mr. Cutting's fall, *see* Dkt. 60-1, at 6, does not mean that he must be excluded as an expert in this matter. Mr. Lough

1    testified that he co-authored the expert reports for this matter with Mr. Schippers. *See id.* He

2    explained that although Mr. Schippers "did all of the legwork," Mr. Schippers would "make

3    notes" and go to Mr. Lough to discuss findings and opinions and make changes together before

4    they submitted the reports. *See id.* Such a practice is not improper. *See Montgomery v. Wal-Mart*

5    *Stores, Inc.*, No. 12CV3057-AJB (DHB), 2015 WL 11233382, at *5 (S.D. Cal. Sept. 24, 2015)

6    ("[J]oint expert reports are not per se improper.").

7          When two experts issue a joint report, it is possible that each expert will address different

8    portions of the report. That appears to be the case here. Defendants state that Mr. Lough was

9    retained "to address the industry standards, offer opinions that the manual rope grab is a safe

10   product and well designed, and provide insight as to the differences between manual and trailing

11   rope grabs." Dkt. 65, at 7. It does not appear that he was retained to address the issues that

12   plaintiffs claim he declined to answer.

13         Accordingly, the Court denies plaintiffs' motion to strike Mr. Lough's declaration or

14   otherwise exclude him as an expert.

15                              **2.      Keith Schippers**

16         Defendants retained Keith Schippers as an expert witness. *See* Dkt. 54-3, at 2. Mr.

17   Schippers is a professional engineer and fall protection person instructor for Gravitec Systems,

18   Inc. *See id.* at 4. Mr. Schippers produced a joint report in which he offers the following three

19   scenarios of what likely caused Mr. Cutting's fall: (1) Mr. Cutting may not have been wearing

20   the harness when he fell; (2) Mr. Cutting may have been wearing the harness but failed to

21   connect it to the rope grab; or (3) Mr. Cutting had too much rope between the rope grab and the

22   anchor for the rope grab to be activated. *See id.* at 12–13.

23

24

1    Plaintiffs seek to exclude Mr. Schippers' opinion regarding his three causation theories.

2    *See* Dkt. 59, at 17. Plaintiffs argue that Mr. Schippers is not qualified to render his opinions as to

3    those three scenarios and that his opinions are not reliable because they are not grounded in

4    science. *See id.* Regarding his qualifications, Mr. Schippers has a B.S. degree in aeronautical

5    engineering with a minor in mathematics. *See* Dkt. 54-3, at 5. He has over ten years of

6    experience as a fall protection person instructor and has been a professional engineer for

7    Gravitec Systems, Inc. since 2006. *See id.* Mr. Schippers designs fall protection systems,

8    conducts fall protection audits, and teaches fall protection courses. *See id.* Based on this

9    experience, Mr. Schippers appears to have the foundation to opine as to what causes someone to

10   fall while using fall protection systems. He is not required to have a background in accident

11   reconstruction or human factors to formulate his opinions. Therefore, Mr. Schippers is qualified

12   to render his opinions as to what may have caused Mr. Cutting's fall.

13   As to the reliability of his opinions, plaintiffs argue that Mr. Schippers "simply arrives at

14   [his] conclusions based on what he thinks might have happened" and that "the actual evidence in

15   this case contradicts each of his hypothetical scenarios." Dkt. 61, at 17. The Court is not

16   persuaded by plaintiffs' arguments.

17   Ms. Schippers based his opinions on his experience and his review of the evidence in the

18   case, such as deposition testimony about Mr. Cutting's fall. *See* Dkt. 54-3, at 13–15. As such, he

19   has sufficient foundation to render his opinions of what caused Mr. Cutting's fall. For certain

20   opinions, the traditional *Daubert* factors are not appropriate measurements of the reliability. *See*

21   *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (holding that the *Daubert* factors

22   were not applicable to an expert's testimony, "whose reliability depends heavily on the

23   knowledge and experience of the expert, rather than the methodology or theory behind it").

24

1    The fact that some evidence may contradict Mr. Schippers' opinions goes to the weight

2    of his opinions, not their reliability. *See Hartley v. Dillard's, Inc.,* 310 F.3d 1054, 1061 (8th Cir.

3    2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the

4    testimony, not the admissibility, and it is up to the opposing party to examine the factual basis

5    for the opinion in cross-examination. Only if the expert's opinion is so fundamentally

6    unsupported that it can offer no assistance to the jury must such testimony be excluded.")

7    (cleaned up). The Court concludes that Mr. Schippers' three scenarios are based on sufficient

8    evidence to survive the *Daubert* inquiry.

9    Accordingly, plaintiffs' motion is denied.

10    **II.    Summary Judgment Motions**

11    Summary judgment is appropriate if a moving party shows that "there is no genuine

12    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

13    Civ. P. 56(a). The materiality of a given fact is determined by the required elements of the

14    substantive law under which the claims are brought. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

15    242, 248 (1986). Factual disputes that do not affect the outcome of the suit under the governing

16    law will not be considered.  *Id.*

17    Where there is a complete failure of proof concerning an essential element of the non-

18    moving party's case on which the nonmoving party has the burden of proof, all other facts are

19    rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex*

20    *Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 254. Once the moving party

21    has carried its burden under Fed. R. Civ. P. 56, the party opposing the motion must do more than

22    simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec.*

23    *Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The opposing party cannot rest solely on

24

1  its pleadings but must produce significant, probative evidence in the form of affidavits, and/or

2  admissible discovery material that would allow a reasonable jury to find in his favor. *Id.* at n.11;

3  *Anderson*, 477 U.S. at 249–50. However, weighing of evidence and drawing legitimate

4  inferences from facts are jury functions, and not the function of the court. *See United Steel*

5  *Workers of Am. v. Phelps Dodge Corps.*, 865 F.2d 1539, 1542 (9th Cir. 1989).

6         When parties file cross-motions for summary judgment, as the parties have done here,

7  each motion "must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc.*

8  *v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The court must review the evidence

9  submitted in support of each cross-motion. *Id.*

10        Here, the parties move for summary judgment regarding defendants' violation of the

11  WPLA. *See* Dkt. 48, at 16; 54, at 20; 55, at 16. The WPLA imposes "strict liability on any

12  manufacturer of a defective product for resulting injuries." *Garza v. McCain Foods, Inc.*, 124

13  Wash. App. 908, 916 (2004). Pursuant to the WPLA, "[a] product manufacturer is subject to

14  liability to a claimant if the claimant's harm was proximately caused by the negligence of the

15  manufacturer in that the product was not reasonably safe as designed or not reasonably safe

16  because adequate warnings or instructions were not provided." RCW 7.72.030(1). There is no

17  dispute that defendants are "manufacturers" or that plaintiff is a claimant. *See* Dkt. 48, at 16, 54,

18  at 20, 55, at 17.

19        Plaintiffs contend that defendants are liable under the WPLA because (1) the product at

20  issue contains a design defect known as the "death grip" hazard and (2) defendants failed to give

21  sufficient warnings about that defect. *See* Dkt. 48, at 17–22. Defendants contend that no such

22  defect exists in the product at issue. *See* Dkts. 54, at 20; 55, at 16–17.

23  ///

24

1 **A.    Design Defect**

2    The WPLA allows for recovery "if the claimant's harm was proximately caused by the

3 negligence of the manufacturer in that the product was not reasonably safe as designed[.]"

4 RCW 7.72.030(1). According to the Supreme Court of Washington, "a plaintiff who seeks to

5 establish liability on the part of a manufacturer under RCW 7.72.030 may do so in two distinct

6 ways." *Soproni v. Polygon Apartment Partners*, 137 Wash.2d 319, 326 (1999). Under the "risk

7 utility analysis, a plaintiff must show that, at the time of manufacture, the likelihood and

8 seriousness of harm caused by the product outweighed the manufacturer's cost and opportunity

9 to design a product that would not have caused that harm." *Bruns v. PACCAR, Inc.*, 77 Wash.

10 App. 201, 209 (1995) (citing RCW 7.72.030(1)(a)). A plaintiff may also employ the "'consumer

11 expectations' test, which requires the plaintiff to show that the product was 'unsafe to an extent

12 beyond that which would be contemplated by the ordinary consumer.'" *Id.* (citing *Falk*, 113

13 Wn.2d at 654). Factors to consider with this test include "[t]he relative cost of the product, the

14 gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating

15 or minimizing the risk[.]" *Seattle–First Nat'l Bank v. Tabert,* 86 Wash.2d 145, 154 (1975).

16    Regardless of which test the Court applies, the parties' motions for summary judgment

17 turn on whether there is an issue of fact as to the existence of a "death grip" hazard in the product

18 at issue. Although the parties each assert there are no uncontested issues of material fact, the

19 Court has a responsibility to determine whether disputed issues of material fact are nevertheless

20 present. *See Fair Hous. Council of Riverside Cty.*, 249 F.3d at 1136; *Osborn v. Butler*, 712 F.

21 Supp. 2d 1134, 1148 (D. Idaho 2010).

22 ///

23 ///

24

1

### 1.    Plaintiffs' Evidence

2      As evidence of the "death grip" hazard in the manual rope grab at issue, plaintiffs rely on

3  a product discontinuation notice issued by 3M, a company that also sells fall protection systems,

4  that announces a new trailing rope grab with an "anti-panic grip feature" that protects against the

5  "death grip scenario." *See* Dkts. 48, at 8 (citing 49-7, at 2). Plaintiffs presented excerpts from

6  Eric Miller and Wei Chieh Hung's deposition testimony that suggests that the "key difference"

7  between trailing rope grabs and manual rope grabs is that "the user will freefall when grabbing

8  the manual rope grab whereas the trailing rope grab contains the Anti-Panic feature." *Id.* at 11

9  (citing Dkts. 49-5, at 8, 11; 49-9, at 9–10). Plaintiffs presented deposition testimony from Eric

10  Miller, who worked at 3M from 2008 to 2012 and has been with Werner since then, currently

11  serving as the vice president and general manager of Werner's fall protection category. *See* Dkt.

12  54-2. Mr. Miller testified that trailing rope grabs with the anti-panic feature are used as fall

13  protection in residential roofing applications. *See* Dkt. 49-5, at 9.

14      Plaintiffs also rely on an opinion from their expert to establish the existence of the "death

15  grip" hazard in the product at issue. Plaintiffs' expert, Dr. Bauer, opined that the manual rope

16  grab at issue only prevents travel along the lifeline if the rope grab is pulled down by the lanyard

17  that connects the user to the rope grab. *See* Dkt. 50-2, at 9. Thus, he claims that if a user grabs

18  the manual rope grab while close enough to prevent the lanyard from pulling on it, the manual

19  rope grab will not arrest the user's fall. *See id.* Based on his tests with the product at issue, he

20  concluded that the rope grab "would have been within an ordinary user's reach upon falling" and

21  that it was "a simple matter to reach out and grab the rope grab." Dkt. 50-2, at 8.

22

23

24

1                          **2.    Defendants' Evidence[2]**

2           As evidence that the death grip hazard does not exist in the product at issue, defendants

3   rely on opinions and testimony from their two experts, Keith Schippers and David Lough. Mr.

4   Schippers and Mr. Lough co-authored two reports for this case in which they explain that the

5   manual rope grab at issue in this case "works by pinching the rope between the pawls of the grab

6   and the lifeline channel of the grab," which is accomplished by pulling on the attachment eye.

7   *See* Dkt. 54-3, at 10. They also state the following regarding the locking mechanism of the

8   manual rope grab—

9               [j]ust grabbing and squeezing the rope grab is not sufficient to disengage the grab
                from the rope. A person must reach the rope grab, grab it in the correct orientation,
10              squeeze down and toward the anchor and keep their own weight from ripping it out
                of their hand while falling. The length of the lanyard assists in preventing the rope
11              grab from being easily grabbed by keeping the rope grab further away from the
                worker and by making it harder to hold onto the rope grab during a fall.

12

13  Dkt. 54-4, at 13.

14          During his deposition, Mr. Lough testified that "it would be impossible to, during a fall,

15  grab the rope grab and open it up and ride it down." Dkt. 54-2, at 66. Mr. Schippers testified that

16  it is unlikely a user can reach the manual rope grab in the position Mr. Cutting described, but

17  even if it is within reach, a user "would then have to overcome not only the distance, but the

18  locking mechanism of the grab as well" because unlocking the manual rope grab requires

19  squeezing and pushing the lever upward. Dkt. 54-2, at 69. He testified that the three-foot lanyard

20  included in the product at issue is a safety feature which puts the rope grab out of reach. *See id.*

21

22

23  _____

24          [2] Defendants moved for summary judgment separately but rely on the same evidence as
    to this issue. *See* Dkts. 54, 55.

1    He testified that the biggest concern with manual rope grabs is the user having the rope grab in

2    hand when he falls. *See id.* at 71.

3           In addition to their expert witnesses, defendants rely on the deposition testimony of Dale

4    King, Wei Chieh Hung, and Eric Miller. *See* Dkts. 54-2, at 5, 19, 32. Mr. King has been with

5    Werner since 1978 and has worked in several product engineering positions including his current

6    position as director of sustaining engineering. *See id.* at 6. Mr. King testified that there have been

7    no prior incident reports related to the product at issue. *See id.* at 11. Mr. Hung testified that the

8    manual rope grab at issue should not move up or down without depressing the bridge of the rope

9    grab. *See id.* at 37. He stated that rope grab specifications did not require manual rope grabs to

10    have an anti-panic feature like trailing rope grabs. *See id.* at 47. He states that manual and trailing

11    rope grabs "are two completely different products" that are "used in two completely different

12    systems." *Id.*

13           Mr. Miller testified that manual rope grabs are the ideal rope grab for short clearances.

14    *See id.* at 23. He also states that users may prefer manual rope grabs over trailing rope grabs

15    because manual rope grabs can lock in place and allow the user to lean against the rope grab,

16    which is useful in sloped surfaces, and cannot be achieved with trailing rope grabs. *See id.* at 23.

17    He states that a trailing rope grab is commonly used in vertical applications such as stage work

18    on the side of buildings or elevator shafts. *See* Dkt. 54-2, at 23. Mr. Miller testified that the

19    "death grip" hazard in trailing rope grabs happens when the user falls and grabs onto the eye of

20    the rope grab, which keeps it in the open position. *See* Dkt. 54-2, at 25. He stated that the "anti-

21    panic" feature in trailing rope grabs addresses the death grip hazard by adding grooves to the top

22    of the rope grab's eye, which "will push in and re-cam that rope grab." *Id.* He stated that the

23    "death grip" hazard has "been primarily identified with self-trailing [rope] grabs due to the

24

1    position of where those rope grabs are in the event of a fall" and due to "grabbing the eyelet and

2    pulling that forward . . . ." *Id.* at 28. When asked if the "death grip" hazard existed in manual

3    rope grabs, Mr. Miller testified that he didn't agree with the notion that squeezing the rope grab

4    or grabbing it from the mouth prevented the device from locking. *See id.* He stated that an

5    upward squeezing motion is what opens the rope grab. *See id.*

### 3.    Analysis

7         Based on the evidence submitted by the parties, the Court disagrees that there are no

8    genuine issues of fact as to the existence of a defect in the product at issue. The Court agrees

9    with defendants that, due to their different locking mechanisms, the existence of a "death grip"

10   hazard in trailing rope grabs is not evidence that the hazard exists in manual rope grabs—which

11   is the product at issue in this case. However, there is still a genuine issue of material fact as to

12   whether there exists a "death grip" hazard, or something similar, that is specific to the manual

13   rope grab at issue in this case.

14        Specifically, there are issues of material fact as to whether the manual rope grab at issue

15   fails to arrest a fall if it is grabbed during a fall. For example, plaintiffs presented evidence, via

16   their expert witness, Dr. Bauer, that the rope grab fails to arrest a fall if the user grabs it in a

17   manner that prevents the lanyard connecting the user to the rope grab from pulling on the rope

18   grab. *See* Dkt. 50-2, at 9. Contradicting this evidence are the opinions of defendants' own

19   experts, who claim that simply grabbing the rope grab will not disengage it from the rope

20   because a person must "grab it in the correct orientation, squeeze down and toward the anchor

21   and keep their own weight from ripping it out of their hand while falling." Dkt. 54-4, at 13.

22   Defendants' expert also claims it is "impossible to, during a fall, grab the rope grab and open it

23   up and ride it down." Dkt. 54-2, at 66. The parties also dispute, as described below regarding the

24

1    issue of proximate cause, whether the "death grip" exists due to the distance of the rope grab

2    from the user.

3         The parties ask this Court to reject each other's evidence regarding the existence of a

4    "death grip" hazard and grant them summary judgment. However, doing so requires this Court to

5    weigh the evidence and draw inferences, which are functions for the jury, not the Court. *See*

6    *United Steel Workers of Am.*, 865 F.2d at 1542. Accordingly, the Court recommends that the

7    parties' cross-motions for summary judgment be denied as to this issue.

8                        **B.    Failure to Warn**

9         The WPLA permits recovery "if the claimant's harm was proximately caused by the

10   negligence of the manufacturer in that the product was . . . not reasonably safe because adequate

11   warnings or instructions were not provided." RCW 7.72.030(1). To prevail on a failure to warn

12   claim, a plaintiff must show that (1) the defendant failed to sufficiently warn, (2) the plaintiff

13   suffered damages, and (3) the defendant's failure to sufficiently warn of the dangers was a

14   proximate cause of the plaintiff's damages. *See, e.g.*, *Little v. PPG Industries, Inc.*, 19 Wn. App.

15   812, 818 n.3 (1978) (approving the Restatement of Torts' recitation of the elements).

16        Plaintiffs argue that defendants failed to warn plaintiff about the "death-grip" hazard or

17   that other rope grabs have an "anti-panic" feature. *See* Dkt. 48, at 22. However, this claim's

18   viability is based on the existence of a "death grip" hazard in manual rope grabs. That is because

19   there would be no need to warn users of a hazard that does not exist in the product at issue. As

20   discussed above, there remain issues of material fact as to whether the death grip hazard or

21   something similar exists in manual rope grabs. Accordingly, the Court recommends that the

22   motions be denied as to this issue as well.

23   ///

24

1

### C.    Proximate Cause

2      Defendants move for summary judgment on the basis that plaintiff has not submitted

3 evidence to establish proximate cause. *See* Dkts. 54, at 23; 55, at 18. To establish a claim under

4 the WPLA, plaintiffs must show that their harm was proximately caused by the alleged defect.

5 *See* RCW 7.72.030(1). "Proximate cause is composed of both cause in fact and legal

6 cause." *Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 289 (2021). "[T]he cause in fact inquiry

7 focuses on a 'but for' connection, [while] legal cause is grounded in policy determinations as to

8 how far the consequences of a defendant's acts should extend." *Id.* The cause in fact inquiry "is

9 generally left for the jury, and it determines what actually occurred." *Id.*

10      Defendants argue that plaintiffs only provide conjecture or speculation and have

11 presented no evidence that Mr. Cutting actually grabbed the rope grab during his fall. *See* Dkts.

12 54, at 24; 55, at 21. Defendants point to Mr. Cutting's deposition testimony in which he states

13 the following when asked if he had his hands on the rope grab at any time during his fall: "It

14 happened very quickly and I was flying through the air. It could have happened. Yes, I reached

15 for it." Dkt. 55-1, at 12. Relying on their experts' opinions, defendants argue that it is unlikely

16 that Mr. Cutting could have reached the rope grab during the fall, *see* Dkt. 54-4, at 11, because

17 their experts' recreation of Mr. Cutting's position on the roof showed that a worker with an

18 additional 2" to 3" of reach compared to Mr. Cutting could not reach the rope grab. *See id.* at 11–

19 12.

20      The Court disagrees that plaintiffs have only provided conjecture and speculation as to

21 whether Mr. Cutting grabbed the rope grab. According to plaintiffs' accident reconstruction

22 expert, Dr. Bauer, the rope grab would have been within reach when Mr. Cutting fell. Dkt. 50-2,

23 at 8, 15. Mr. Cutting testified that he reached for the rope grab as he fell and that the rope grab

24

1   ended up at his eye level when he was sitting on the ground after he fell. *See* Dkt. 49-1, at 21–22.

2   Dr. Bauer opined that the rope grab at issue only prevents travel along the lifeline if the rope

3   grab is pulled down by the lanyard that connects the user to the rope grab, but if a user grabs the

4   manual rope grab while close enough to prevent the lanyard from pulling on the rope grab, the

5   manual rope grab will not arrest the user's fall and it will travel along the lifeline. *See* Dkt. 50-2,

6   at 9. Based on this evidence, a reasonable jury could conclude that Mr. Cutting grabbed the rope

7   grab as he fell.

8        Defendants also argue that the evidence suggests that Mr. Cutting's fall was not the result

9   of him grabbing the rope grab, but rather the result of him misusing the fall protection system.

10  *See* Dkt. 54, at 26; 55, at 21. For example, defendants argue that the most likely scenario was

11  that Mr. Cutting was not connected to the harness. *See* DKt. 55, at 21. To support this scenario,

12  defendants rely on the fact that Mr. Cutting testified that he did not recall if he had the harness on

13  when the paramedics arrived or who took the harness off. *See id.* at 13–14. Defendants also

14  provide the deposition testimony of Mr. Jeffrey Dale Gerbing, who was at the scene of the

15  accident and testified that he did not recall if Mr. Cutting was transported by the fire department

16  with the harness on. *See id.* at 18. And defendants provide deposition testimony from the first

17  responders who arrived at the scene of the incident and testified that they did not recall whether

18  Mr. Cutting was wearing a harness when they arrived at the scene. *See* Dkt. 55-1, at 71, 74, 77–

19  79. However, it is up to the trier of fact to weigh the evidence and determine what actually

20  occurred. The Court sees no reason to depart from the general rule that the proximate cause

21  determination should be left to the trier of fact. *See Meyers*, 197 Wn. 2d at 289.

22       Accordingly, the Court recommends that defendants' motions for summary judgment as

23  to causation be denied.

24

1

**D.    Other Issues**

2      In its reply brief, the Werner defendants argue that the Court should at least grant

3  summary judgment for defendant Home Depot U.S.A., Inc. because plaintiffs "largely ignores

4  defendant Home Depot" and because plaintiff did not present evidence that defendant Home

5  Depot was independently negligent or that the product manufacturer is insolvent. *See* Dkt. 67, at

6  2. However, the Werner defendants did not move for summary judgment on that basis and are

7  raising the arguments for the first time in their reply, which the Court will not consider.

8  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not

9  consider arguments raised for the first time in a reply brief.");  *United States ex rel. Giles v.*

10  *Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to

11  introduce new facts or different legal arguments in the reply brief than those presented in the

12  moving papers.").

13  **III.    Plaintiffs' Motion to Strike Affirmative Defenses**

14      In their motion for partial summary judgment, plaintiffs move the Court to strike several

15  affirmative defenses defendants asserted in their answers. *See* Dkt. 48, at 23–26. "The court may

16  strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or

17  scandalous matter." Fed. R. Civ. P. 12(f). Under this rule, the Court may strike an affirmative

18  defense if it "is insufficient as a matter of law." *FDIC v. Crosby*, 774 F. Supp. 584, 585 (W.D.

19  Wash. 1991). "An affirmative defense is insufficient if as a matter of law if it cannot succeed

20  under any circumstances." *Id.* at 586.

21      Plaintiffs move to strike the Yoke defendants' affirmative defense numbers 1, 2, 3, 4, 6,

22  7, 9, 10, 11 and the Werner defendants' affirmative defense numbers 1, 2, 3, 4, 6, 7, 8. *See* Dkt.

23  48, at 23–26. All defendants concede that the Court should strike affirmative defense number 1.

24

*See* Dkts. 58, at 24; 57, at 7. The Yoke defendants also concede to strike their affirmative

defense number 7. *See* Dkt. 57, at 7. Thus, the Court recommends that the District Court grant

plaintiffs' motion in this regard and strike defendants' affirmative defenses of failure to state a

claim and the Yoke defendants' affirmative defense of statute of limitations.

   Plaintiffs also argue that the Yoke defendants' affirmative defense of industry standard is

not an affirmative defense but rather an argument that the product is not defective. *See* Dkt. 48,

at 26. The Court agrees with plaintiffs. The authority provided by the Yoke defendants states that

evidence of industry standard is relevant to the inquiries of whether the product is defective, not

that it is an affirmative defense. *See Falk v. Keene Corp.*, 113 Wash.2d 645, 655 (1989) ("RCW

7.72.050(1), which provides for admissibility of evidence of industry custom and technological

feasibility, and evidence of whether or not the product was in compliance with nongovernmental

standards or with legislative or administrative regulatory standards, is relevant to the inquiries

under both RCW 7.72.030(1)(a) and (3)."). Accordingly, the Court recommends that plaintiffs'

motion be granted in this regard and that the Yoke defendants' affirmative defense of industry

standard be stricken. *See* Dkt. 34, at 6.

   The Court has reviewed the parties' arguments regarding the remaining affirmative

defenses and concludes that plaintiffs have not shown that those affirmative defenses cannot

succeed under any circumstances. Whether these affirmative defenses are viable should be left to

the trial. *See Hull v. Remington Arms Co., Inc.*, CV–10–05010–RBL, 2011 WL 338803, *4

(W.D. Wash. Feb. 3, 2011) (declining to dismiss affirmative defenses because "removal of these

issues from the case would not make it meaningfully easier, faster, or more efficient to try").

Therefore, the Court recommends that plaintiffs' motion be denied as to the remaining

affirmative defenses.

1

**CONCLUSION**

2        The Court grants in part and denies in part the Werner defendants' motion to exclude

3    expert witnesses. Dkt. 56. The Court denies plaintiffs' motions to strike defendants' expert

4    testimony. Dkts. 59, at 15; 61, at 15.

5        The Court recommends that the parties cross-motions for summary judgment be denied.

6    Dkts. 48, 54, 55. The Court also recommends that plaintiff's motion to strike defendants'

7    affirmative defenses be granted in part and denied in part. Dkt. 48, at 23–26.

8        Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

9    fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

10   6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

11   review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

12   of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

13   *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

14   imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **August 5,**

15   **2022,** as noted in the caption.

16

17       Dated this 20th day of July, 2022.

18

19                                                    J. Richard Creatura

20                                                    Chief United States Magistrate Judge

21

22

23

24